### JOHN WHITFIELD v. THE STATE.

#### No. 1816.   Decided December 7, 1898.

**1. Murder in the First Degree—Evidence Sufficient.**

See opinion for evidence summarized, which, though circumstantial, the court holds amply sufficient to support a verdict and judgment of murder in the first degree with penalty assessed at life imprisonment in the penitentiary.

**2. Same—New Trial—Newly Discovered Evidence.**

A new trial will not be granted for newly discovered testimony which is immaterial and simply to contradict a witness.

**3. Same.**

A new trial will not be granted for newly discovered testimony which would only be of an impeaching character.

**4. Same—Diligence.**

A motion for new trial for newly discovered evidence, will not be granted where but slight diligence would or should have discovered the facts set up in the motion.

APPEAL from the District Court of Brazoria. Tried below before Hon. T. S. REESE.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of Sam Shiver, on the 15th day of May, 1898, by shooting him with a gun.

The opinion states the case.

*F. J. & R. C. Duff,* for appellant. [No briefs found with the Record. —Reporter.]

*Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal.

There are two grounds of error urged why the judgment should be reversed. The first is based upon the insufficiency of the evidence to support the conviction, and the second on the alleged error of the court overruling the motion for a new trial, based upon newly-discovered testimony. The evidence discloses that the deceased, Sam Shiver, was shot through the window of a church, on the third Sunday in May of the present year. He was shot in the back of the head, with Nos. 3 and 4 shot. The wadding used in the gun was "black moss." The window through which he

was shot was elevated somewhat above the other windows in the house; and the party who did the shooting placed a ladder against the house, and climbed upon it, in order to be able to shoot his victim.   The report of the gun, while not the same as a Winchester, had a sound somewhat like that character of gun.   It is shown by the testimony as an uncontradicted fact that appellant had an Enfield rifle, the tube of which had a hole in the side of it; and from this hole, when the gun was fired, some of the powder would escape, which gave it the peculiar sound referred to above.   It is further shown by a witness who had used appellant's gun, and was very familiar with it, and had recently before the homicide borrowed and used it, that the shot he returned defendant with the gun were Nos. 3 and 4, and that defendant used black moss as a wadding in loading said gun.   Appellant was also seen to load the gun on the evening previous to the homicide, at night, with the character of shot and wadding above described.   It is further shown that he threatened the life of the deceased on Friday night before the homicide, which occurred the following Sunday night.   The reason stated for this threat was that deceased "had taken his wife."   He was urged against the execution of this threat, because "there were too many women in the world."   Defendant stated to another witness "that some one was bothering him, and that he intended to kill him."   Upon being requested to know who it was, he replied that the witness "would know soon enough."   He said that he "was going to wear stripes for the damn·son of a bitch."   On the same night, and subsequent to the killing, after they had returned from · church, and retired, defendant said to the witness Wilson: " 'I did that.' I says, 'Did what?' In about a minute he said again, 'I did that.' I didn't say anything in reply to him.   Defendant then said, 'There are only three that I am afraid of.' I thought he was talking about his wife, and did not pay much attention.   Defendant spoke again, and said, 'The three I am afraid of are Anderson Dawson, Dickie Dawson, and Allen Fay.' He said, 'Allen Fay saw me, but I don't know if he made me out. I do not think Allen Fay made me out.' " This homicide occurred at Bethelder Church, at about 11 or 11:30 o'clock at night.   The deceased was in the pulpit, taking up a collection, when the shot was fired from the outside, taking effect in the back of his head.   The State introduced Allen Fay, who, after locating himself at Bethelder Church, said: "I got to the church about 8:30 that night.   As I came up to the church, I saw the defendant, John Whitfield, peeping in at the window.   He was standing, seemingly, on his tiptoes, leaning over.   He seemed to be bracing himself, as he leaned over, on a gun or a stick; I could not see which.   I know the defendant well.   It was him that I saw.   I am not mistaken. It was John Whitfield I saw looking into the window.   *   *   *   Deceased was shot in the back of the head, with small shot and a wadding of black moss. [Here witness was shown the wadding and shot, and said it was the wadding and shot taken from the deceased's head.]   I know of no trouble between defendant and deceased, only this: I heard defendant say about a year ago that 'Sam Shiver owed him (defendant) sixty

cents for picking cotton, and damned if he didn't shoot his head off if he (Shiver) didn't pay it.' " Lee Cooper testified that he "passed defendant's house about dark. He told me he had to go to Bethelder Church that night; that he had to carry a lady." Dickie Dawson testified: "I was at home on the night of the killing. Just before sundown of that day, I went to the house where defendant and Ed. Wilson lived, to see Ed. Wilson. Ed. Wilson was not there, but the defendant was. Just before I got to the house I came up with the defendant. He had his gun on his shoulder,—an Enfield musket. He said he had shot at a rabbit, and missed it. I told him to let me have the gun, and shoot. He said, 'No,' he didn't have but one load, and he wanted that for a certain purpose. We went on to the house, and stopped on the gallery, and defendant loaded the gun. I watched him load it. He used shot which I took to be number three or four, and black moss wadding." This witness remained with the defendant only a few moments, and went home. Charles Adams testified that at the request of the sheriff, on Monday morning following the shooting at night, he went to the defendant's house, and got the Enfield musket, and it was then empty. The sheriff testified that the deceased was shot in the back of the head with small shot, and that "black moss wadding" was taken out of his head with the shot. He further testified that he examined the inside of the gun Monday morning, and it showed that it had been lately discharged. About two weeks after the defendant's arrest, he stated to the sheriff that he knew who killed deceased, and that it was his roommate, Ed. Wilson, who did it. Wilson was arrested, but there was no evidence against him, and he was discharged. Anderson Dawson was offered by the State, but defendant produced a record of his conviction of a felony, as the basis of his objection to the competency of said Dawson as a witness. The objection was sustained, and the witness was not permitted to testify. Defendant relied upon an alibi, and produced several witnesses to prove that he was at the Mt. Olive Church, some two and one-half or two and three-quarters miles distant from the scene of the homicide; that he went to said Mt. Olive Church at an early hour in the evening, and remained there until about 12 o'clock that night. These witnesses testified in detail as to circumstances showing their knowledge of the fact that defendant was present at Mt. Olive Church; that he did not go into the church, but remained outside, near the church.

In regard to the first assignment of error, we believe this is a sufficient recitation of the facts to show there was a sharp conflict in the evidence as to the presence of the defendant at the time and place of the homicide. This issue was submitted to the jury under appropriate instructions, and the jury decided adversely to appellant. We are of opinion that, under the rules governing circumstantial evidence, this testimony was sufficient to justify the verdict of the jury, and we do not feel authorized to disturb their finding.

The alleged newly discovered testimony is to be found in the affidavits of John Tankersley, Tommie Love, Moses Cooks, and Amanda and Let-

tie Whitfield. The affidavit of John Tankersley attacks the testimony of Dickie Dawson. He states that Dawson, on the Sunday evening preceding the homicide, at night, was at the baseball grounds on the Palo Alto place, about four and one-half miles from the house of the defendant, at 5:30 o'clock, the time the ball game terminated. He further states that, in view of this fact, it was impossible for said Dawson, at the time stated by him, to be at the house of defendant, his reasons for stating this being "that affiant was riding. Immediately after the ball game, he went on to his home. At the time he arrived at home, it was then fifteen minutes before sundown. The witness Dawson was walking, and the home of the defendant, Whitfield, was about two miles further on than that of affiant." He further stated that said Dawson, before the trial of appellant, told him that his interview with appellant occurred at 4 o'clock on the evening prior to the homicide. Tommie Love stated in his affidavit that he was at said ball game, and that Dawson was there; that it broke up at 5:30; that he walked from the baseball grounds to John Tankersley's place, where he resided; that it was then about sundown; that defendant lived two miles further on; and that Dawson was walking. They both state that Dawson has a bad reputation for truth and veracity. Moses Cooks' affidavit shows that he was at Mt. Olive Church on the night of the homicide, and that he saw Willis Love, one of the principal witnesses for the State, walk up to the defendant, and obtain from him a cigarette, and engage him in conversation; that he also saw defendant off and on about the church for about one hour; and that he saw him after church with the congregation, going away from said church. Amanda Whitfield states in her affidavit that Willis Love told her, in the presence of Lettie Whitfield, subsequent to the killing, that he (Love) saw defendant at Mt. Olive Church on the night of the homicide, and just before the church "broke up;" that defendant was leaning in at the window of the church; that she saw Willis Love approach the defendant, and engage him in conversation, and get a cigarette from him. Lettie. Whitfield states in her affidavit that she is the wife of the defendant; that Love told her that he saw defendant at Mt. Olive Church, and that defendant gave him a cigarette at said church on the night of the homicide. This is the substance of the affidavits setting up newly discovered testimony.

Willis Love testified that he was present at Mt. Olive Church, and that he did not see the defendant at said church on the night of the homicide. Appellant was a witness in his own behalf, and testified that he talked with Love at said Mt. Olive Church, and gave him a cigarette. This testimony would tend in the main to discredit the witness Love as to seeing appellant at said church. The fact that Love was at the church is an uncontradicted fact. If the testimony is used to show the presence of either Love or appellant at said Mt. Olive Church, it would be cumulative, because, as before stated, it is an uncontradicted fact that Love was at Mt. Olive Church. Defendant's whole defensive theory was based upon

40th Crim. Reps.—2

the fact that he was at said church, and he introduced several witnesses to prove that fact. So, we are narrowed down to the contradiction between the parties as to whether or not Love and appellant met at said church. While, as original testimony, this would be admissible, still we do not believe, under the facts and circumstances of the case, that it is of sufficient importance to justify a reversal of the judgment, in view of all the evidence introduced upon the trial.

With reference to the attack made upon the witness Dawson by this newly discovered testimony, we do not believe it sufficient to justify a reversal. While upon the stand, appellant himself testified that said Dawson was at his house on Sunday evening prior to the homicide, at night, and wanted to borrow his gun, and that he (appellant) refused to lend it to Dawson. While appellant does not state the exact hour of the evening at which Dawson was at his house and sought to borrow his gun, yet he states that it was on this particular Sunday evening. In this connection, appellant testified: "Dickie Dawson was at my house that evening. He did not see me load my gun. He asked to borrow my gun. I told him I had no ammunition." So, there is no discrepancy between appellant and Dawson, that Dawson was at appellant's house on the Sunday evening in question, and that the gun in question was under discussion between them. This homicide occurred on the third Sunday night in May; and whether Dawson had time after the ball game, which these newly discovered witnesses say closed at 5:30 o'clock, to go thence to appellant's house before sundown or not, we take it, would be an immaterial matter; or whether he was at appellant's house before or subsequent to the ball game would be a matter of comparatively small moment.

The affidavits of the defendant's wife and Amanda Whitfield would simply bring up the question as to whether Love had the conversation with them of which they speak, and the testimony would only be of an impeaching character. The defendant's evidence, both by himself and his witnesses, if it proves anything, shows that he was at Mt. Olive Church on the night in question, and did not go in the church, but was moving around the grounds outside the church, and mingling with those who were also outside. They all recognized him, and he seems to have recognized them; and if, as a matter of fact, he and Willis Love were both there, and outside the church, among those who were moving around upon the grounds, it was certainly his duty to have investigated the matter sufficiently to ascertain by whom he could prove the fact that he and Love met as testified by these witnesses in their affidavits. It occurs to us that very slight diligence would have discovered the facts set up in his motion for a new trial. We have not discussed the inherent weakness of these affidavits in regard to their manner of stating facts in connection with their leaving the baseball grounds and going home. It is not stated in these affidavits that they went directly from the baseball grounds to their place of residence. It is stated that they went home; but if it was a fact that they went directly home, without going about the neighborhood, or without stopping by the wayside, it would have been a very easy

matter to have stated those facts. This was not done. The statements are of a very general character. We do not think the alleged newly discovered testimony, in view of the evidence in the record, justifies a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*